```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF KENTUCKY
```
**LEXINGTON**

| | |
|---|---|
| LARRY MOORE, | ) |
| | ) |
|     Plaintiff, | ) |
| v. | )  Civil Action No. 5:05-170-JMH |
| | ) |
| METROPOLITAN LIFE INSURANCE | ) |
| CO. a.k.a. METLIFE, | )  **MEMORANDUM OPINION AND ORDER** |
| | ) |
|     Defendant. | ) |

**       \*\*     \*\*     \*\*     \*\*     \*\***

Plaintiff Larry Moore filed this action seeking review of the denial of benefits under a long-term disability plan by Defendant Metropolitan Life Insurance Company ("MetLife"). Pursuant to the procedures for review of administrative decisions under ERISA, MetLife has moved the Court for affirmance of its decision [Record No. 17].[1] All responses having been filed, this matter is now ripe for review.

## I. BACKGROUND

*A.  Procedural History*

Plaintiff worked for Bramco, LLC as a product support sales representative from March of 1988 through December of 2003. On December 8, 2003, Plaintiff was placed on medical leave based on what he described as mental suffering, pain due to fibromyalgia,

---

[1] The Sixth Circuit has directed that neither summary judgment nor a bench trial is the appropriate method for review of a denial of benefits under ERISA. Instead, the plan administrator should move the court for affirmance of its determination. *See Wilkins v. Baptist Healthcare Sys.*, 150 F.3d 609, 619 (6th Cir. 1998). The Court only considers the information that was available to MetLife at the time of MetLife's determination. *See id.*

ankle pain, and sleep apnea. On February 16, 2004, Plaintiff applied to Bramco for long-term disability benefits established under a plan administered by Bramco and insured by MetLife.

Under the terms of the plan, Plaintiff is considered disabled if he is unable, while receiving appropriate ongoing care, to earn more than 80% of his predisability wages in the local economy. For the first three years, Plaintiff must show only that he is unable to earn this amount at his own occupation; after three years Plaintiff must show that he cannot earn that amount at any job within the local economy. Plaintiff's denial in this case came within the three-year period, and therefore the question is whether Plaintiff could have earned 80% of his predisability earnings working as a sales representative.

B.  *The Initial Denial*

The disability application was sent to MetLife, and on July 21, 2004, MetLife notified Plaintiff that his application had been denied. MetLife's initial denial of benefits was based on the opinions of five physicians who had treated Plaintiff. Dr. Paul Maynard, a family physician, submitted an attending physician statement that listed diagnoses of fibromyalgia and depression but also indicated that Dr. Maynard had advised Plaintiff to return to work. Dr. Maynard's report indicated that Plaintiff had slight psychological limitations but was "able to function in most stress situations and engage in most interpersonal relations." Dr.

2

Maynard also recommended physical therapy and counseling.

MetLife also reviewed office notes of another of Plaintiff's regular physicians, Dr. Paul Goldfarb. Dr. Goldfarb observed in his notes that "the patient really continually came up with one complaint after another and wonders about and seemed to ask a lot about disability. . . . Discussed with the patient that based on what I am seeing, I really have no bases for disability. I will be happy to fill anything out but I do not believe that this will be of benefit." Dr. Goldfarb's notes indicate that his impression was that Plaintiff suffered from fibromyalgia that caused "significant problems" and arthralgias, with "no evidence of arthritis."

Records from orthopedists Dr. Lisa DeGnore and Dr. Chad Mathis were also reviewed. Both Dr. DeGnore and Dr. Mathis noted pain in Plaintiff's ankle and an antalgic gait, and both recommended conservative treatment, including glucosamine, a brace, and a steroid injection. The record also included physical therapy reports containing results of tests of Plaintiff's functional abilities. For example, Plaintiff was found to be able to occasionally bend, squat, crawl, and climb stairs, and was found to be able to lift thirty pounds occasionally and fifteen pounds frequently.

MetLife also reviewed the notes of Plaintiff's psychiatrist, Dr. Ila Patel, taken during the Autumn of 2003. Dr. Patel diagnosed Plaintiff as depressed, described the therapy as

3

"supportive maintenance," and noted some improvement from visit to visit.

MetLife concluded that based on the records it had been provided, Plaintiff's ailments were not severe enough to prevent Plaintiff from returning to his job, and therefore that he was not disabled under the terms of the plan.

C.  *The Appeal*

Plaintiff appealed and also submitted additional medical records to MetLife. MetLife hired two physicians to review Plaintiff's medical records. Dr. Robert Porter, an occupational medicine specialist, reviewed the records and the job description submitted by Bramco and concluded that Plaintiff's records did not establish disability. Dr. Porter noted that fibromyalgia was common in the working population and also that Plaintiff's ankle pain and sleep apnea were long-standing, predating the claimed inability to work. Dr. Porter also noted Dr Goldfarb's comments about disability and that there was no suggestion that Plaintiff's ankle pain prevented him from walking and standing in the performance of his job.

Dr. Schroeder, a psychiatrist, also reviewed Plaintiff's records and concluded that his mental health problems were not severe enough to prevent him from returning to his job. In addition to the records submitted for the initial determination, Dr. Schroeder reviewed additional records from Dr. Patel, a

psychological evaluation performed by Dr. Herbert Steger, and documents from one of Plaintiff's family physicians, Dr. Ronald Centner. Dr. Schroeder noted that both Drs. Patel and Steger found "essentially intact mental status examinations . . . [and that] neither document specific functional impairment restrictions or limitations."

Dr. Schroeder also noted the differing GAF scores[2] attributed to Plaintiff by the two psychiatrists: Dr. Patel scored Plaintiff in a range characterized by moderate symptoms or moderate difficulties in occupational settings; Dr. Steger scored Plaintiff in a range characterized by serious symptoms or serious impairments in occupational functioning. Dr. Schroeder concluded that Dr. Patel's score was both more consistent with Plaintiff's history and more reliable since there was no indication from Dr. Steger whether the lower GAF score was based solely on Plaintiff's subjective reporting.

Dr. Schroeder also discounted the significance of a personality assessment inventory ("PAI") test performed by Dr. Steger, stating that the PAI is unreliable and is designed only to raise hypotheses about potential conditions rather than to establish a diagnosis. In support of his position that the PAI is

---

[2] The GAF, or Global Assessment of Functioning score rates a patient's overall psychological functioning on a scale of 0-100. According to Dr. Schroeder's report, the GAF score may be based on either documented functional impairments or a patient's subjective reports.

5

an unreliable diagnostic tool, Dr. Schroeder noted that Plaintiff's PAI results suggested that Plaintiff suffered from eleven distinct and widely-varying disorders.

Although the records show that Dr. Schroeder reviewed the reports from Dr. Centner, neither Dr. Schroeder's report nor MetLife's statement of its reasons for denial address the contents of that report.  Dr. Centner, a family physician, prepared a report to be used in support of Plaintiff's application for social security disability benefits.  Dr. Centner diagnosed Plaintiff as moderately depressed and in need of medication adjustments and psychotherapy.  Dr. Centner opined that Plaintiff had good ability to follow work rules, fair ability to relate to co-workers, use judgment, and interact with supervisors, and poor or no ability to deal with the public, deal with stress, function independently, and maintain concentration.

D.   *The Instant Action*

Plaintiff filed this action in state court alleging violations of the Kentucky Unfair Claims Settlement Practice Act, and MetLife removed the action to this Court, claiming that Plaintiff's claims were preempted by ERISA.  While the parties initially disagreed whether the disability plan was governed by ERISA, they later agreed that ERISA does apply.[3]  Pursuant to the procedures for

---

[3] Of course, the mere consent of the parties is insufficient to grant the Court subject matter jurisdiction, but in this instance the Court finds that it does have jurisdiction for

review of benefits decisions under ERISA, MetLife has moved this Court for affirmance of its decision to deny benefits.

## II. STANDARD OF REVIEW

The Court reviews a decision to deny ERISA benefits *de novo*, unless the plan grants MetLife discretionary authority to determine eligibility. *See Kalish v. Liberty Mut. Co.*, 419 F.3d 501, 505-506 (6th Cir. 2005) (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). If MetLife is granted such discretion, the Court only reviews the denial of benefits to determine whether MetLife's decision was arbitrary or capricious. *See id.* Therefore, the first task for the Court is to determine whether MetLife is granted discretion under the plan.

Although Plaintiff is correct that MetLife is not the plan administrator,[4] the plan nevertheless grants a certain amount of discretionary authority to MetLife. The plan provides that "MetLife in its discretion has authority to interpret the terms,

---

the reasons stated in MetLife's notice of removal and brief on whether ERISA applies. This is indeed the type of action for benefits pursuant to 29 U.S.C. § 1132(a) in which ERISA completely preempts state causes of action.

[4]   Plaintiff is also correct that MetLife misquotes portions of the plan rather egregiously, as for example when MetLife quotes the plan as stating that "benefits under the Plan are administered and insured by MetLife." MetLife's Resp. at 2. No such quote exists on the page of the record cited by MetLife or anywhere else in the record as far as the Court can tell. The section of the plan on the cited page that MetLife is apparently misquoting states only that the benefits are insured by MetLife, not that they are administered by MetLife.

conditions, and provisions of the entire contract." While it could be argued that this grant of authority does not explicitly extend to the determination of disability, a later provision expands on the allocation of discretion:

> In carrying out their respective responsibilities under the Plan, the Plan Administrator *and other Plan fiduciaries* shall have discretionary authority . . . to determine eligibility for the entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious. (Emphasis added.)

The question thus is whether MetLife qualifies as a fiduciary of the plan.

As the plan itself does not define who is a fiduciary, the Court looks to the statutory definition. Under ERISA, "a person is a fiduciary with respect to a plan to the extent (I) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority control respecting management or disposition of its assets . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(a)(21). Clearly, MetLife has *some* discretionary authority or responsibility in the administration of the plan, as evidenced by the first quotation from the plan cited above, and therefore MetLife qualifies as a fiduciary under the statute. And as the plan grants discretionary authority over benefits determinations to

8

fiduciaries, MetLife's decision is subject to review only to determine whether it was arbitrary or capricious.[5]

Review under the arbitrary or capricious standard is the "least demanding" form of judicial oversight. *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003). "[W]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Id.* (quoting *Williams v. Int'l Paper Co.*, 227 F.3d 706, 712 (6th Cir. 2000)). The Court "must accept a plan administrator's rational interpretation of a plan even in the face of an equally rational interpretation offered by the [plan] participants."[6] *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 298 (6th Cir. 2005). Moreover, "[g]enerally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA

---

[5] Admittedly, there is a certain bootstrapping nature to this logic. The plan grants MetLife some discretion, so therefore they are a fiduciary, and because they are a fiduciary they are considered to have even more discretion. However, this result is dictated by the terms of the plan. In addition, the Court notes that in other cases in which an insurance company was not explicitly labeled a fiduciary but administered claims and had authority to grant or deny claims, courts have found that the insurance companies were fiduciaries under the statute. *See, e.g.*, *Libbey-Owens-Ford Co. v. Blue Cross & Blue Shield Mut.*, 982 F.2d 1031, 1035 (6th Cir. 1993).

[6] Although this and other quotes specifically refer to plan administrators, these statements on the standard of review apply equally to a party such as MetLife who is not the administrator but whose actions are to be reviewed under an arbitrary and capricious standard.

benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious . . . ." *McDonald*, 347 F.3d at 169.

### III. DISCUSSION

It is not disputed that Plaintiff suffers from serious and painful medical problems. Unfortunately for Plaintiff, however, this is not all that he must prove. Plaintiff must show that MetLife can offer no rational explanation for its decision that he was unable to return to his own job, and if there is credible evidence supporting MetLife's determination, the Court must rule in MetLife's favor. *See id.* Plaintiff raises several arguments, but none are ultimately persuasive.

*A.   File Review*

First, Plaintiff argues that MetLife relied too heavily on a file review of Plaintiff's medical records rather than the opinions of physicians who had actually examined Plaintiff.[7] As the Sixth Circuit recently wrote, while "reliance on a file review does not,

---

[7] In a related matter, Plaintiff refers frequently to MetLife's failure to respect the opinion of the "treating physicians." To the extent that Plaintiff is suggesting that something similar to the treating physician rule in social security cases should apply to ERISA determinations, that suggestion was rejected by the Supreme Court in *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). A court also may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* at 834. This does not mean, of course, that the opinions of physicians who treated Plaintiff are entitled to *less* weight; it merely means that the opinions of treating physicians are not accorded the deference they receive in social security cases. And, in any case, in this determination MetLife *did* credit the opinions of several of Plaintiff's treating physicians.

standing alone, require the conclusion that [an insurer] acted improperly . . . the failure to conduct a physical examination . . . may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005); *see also Kalish*, 419 F.3d at 508. In *Calvert*, the Sixth Circuit found that the opinions of the physicians hired to review the medical records were inconsistent with "objectively verifiable" determinations made by the claimant's physicians.

In contrast to *Calvert*, in this action the opinions of the reviewing physicians are generally consistent with the evidence. Dr. Maynard advised Plaintiff to return to work, and Dr. Goldfarb, although noting that Plaintiff's fibromyalgia caused "significant problems," nevertheless stated in his own notes that Plaintiff was not disabled.[8] A number of physicians who examined Plaintiff referred to Plaintiff's problems as moderate. All physicians who treated Plaintiff recommended what the reviewing physicians characterize as conservative treatment, which MetLife and the reviewing physicians take as an indication that Plaintiff's problems were not so severe as to prevent work as a sales

---

[8] Admittedly, Dr. Goldfarb's statement is not definitive as there is nothing to suggest that he had the plan's specific definition of disability in mind. Nevertheless, it lends support to the reviewing physicians' opinions.

11

representative.[9]

In instances in which the determinations by Plaintiff's various physicians point in more than one direction, the reviewing physicians have stated plausible reasons for believing one over the other. For example, as noted above, Dr. Schroeder explained that he found Dr. Patel's GAF determination more reliable than Dr. Steger's because it was consistent with Plaintiff's history and other diagnoses of "moderate" symptoms, and also because it was not clear from Dr. Steger's report whether his assessment was based solely on Plaintiff's subjective reports. Plaintiff characterizes the failure to credit Dr. Steger's GAF score as an arbitrary decision, but the Court finds that Dr. Patel has offered a sufficiently rational explanation. Therefore, the Court cannot find that reliance on such an opinion was unreasonable.

B.  *MetLife's Conflict of Interest*

---

[9] The Court is not well-placed to judge whether a particular course of therapy is conservative or not, but Plaintiff has not rebutted MetLife's characterization, and the Court finds that MetLife's argument is rational. For example, when Plaintiff asked one of the orthopedists about ankle surgery, the orthopedist recommended physical therapy and a brace instead, and suggested that Plaintiff return in three to four months. While a delay of three to four months between treatments may to a large extent simply reflect the realities of the modern health care system, it is also suggestive of an ailment not of such a severity as to require immediate attention. Similarly, while the psychiatrists opined that psychotherapy might be helpful, none put him on an aggressive treatment plan; Dr. Patel identified his treatment goals as "supportive maintenance" and reported some success with that approach. Again, the Court finds MetLife's reliance on such factors to be rational.

Plaintiff also argues that MetLife had a conflict of interest that taints its determination. It is true that any time a company is both the one paying benefits and the one determining whether benefits should be paid, there is a conflict of interest. *See Kalish*, 419 F.3d at 506. As the Sixth Circuit recently noted, an insurer "incurs a direct expense as a result of the allowance of benefits, and it benefits directly from the denial or discontinuation of benefits." *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 521 (6th Cir. 1998)  While this conflict of interest does not alter the arbitrary and capricious standard, it is a factor that the Court must consider. *See Kalish*, 419 F.3d at 506.

The existence of the conflict may very well be the factor that tips the scales in favor of a claimant when an insurer's explanation for the denial of benefits strains the limits of credibility. However, as noted above, MetLife has provided rational explanations, with citations to the records of numerous physicians, for why it concluded that Plaintiff was not disabled. If a conflict of interest were itself sufficient to force courts to overturn reasoned denials of benefits, claimants would always win when the insurer makes disability determinations. Obviously that is not what is intended by the statute or by the case law, and in this matter the Court sees no indication that the conflict of interest was a factor in the determination.

13

C.  *Plaintiff's Job Description*

Plaintiff's best argument is that MetLife and the physicians who reviewed Plaintiff's file failed to properly consider Plaintiff's job requirements. However, this argument also is insufficient to find that MetLife failed to act rationally. Early in the process, Bramco provided MetLife with a summary of Plaintiff's job, including a section describing the physical requirements. For example, Plaintiff focuses on the requirement that (according to Bramco) Plaintiff was required to occasionally (1-33% of the time) lift or carry between twenty-one and fifty pounds. Although the letters denying both the initial claim and the appeal and the records of the reviewing physicians indicate that the job description was considered, there is no explicit mention of the particularized physical requirements.

Plaintiff argues that this indicates that MetLife's denial was arbitrary, since he was entitled to benefits if he was unable to perform his own job. The Court is tempted to agree, and MetLife would be well-advised to more explicitly link their determination to the job description. However, the Court finds that this is insufficient to overturn MetLife's determination for two reasons. First, MetLife and the reviewing physicians placed substantial weight on the fact that Plaintiff's conditions existed during the time he was working, and reasoned that if the depression, ankle pain, fibromyalgia, and sleep apnea were conditions he suffered

14

from during the years he was working, there was no reason to think that he could not return to his job. There is little evidence that his condition changed in late 2003 or 2004,[10] and therefore MetLife could have rationally concluded that there was no evidence that Plaintiff could not return to work.

Second, it is not clear that Plaintiff could not meet the standards required. As to lifting, which is Plaintiff's main focus, Bramco checked a box indicating that Plaintiff was required to occasionally lift or carry twenty-one to fifty pounds. Plaintiff's physical therapist reported that he could lift thirty pounds, which is within the range. It would be helpful to have a more precise statement from Bramco so the Court could know where in the twenty-one to fifty pound range Plaintiff's lifting responsibilities lay. All the checked box really indicates is that Plaintiff had to occasionally lift at least twenty-one pounds, and the record indicates that he could lift thirty. This, combined with the fact that Plaintiff suffered from all of his physical ailments during the time he was working supplies a basis for a rational belief that Plaintiff was able to meet the physical requirements of the job.

D.  *Summary*

---

[10] The one notable exception is the lower GAF score reported by Dr. Steger in 2004, but as explained above, MetLife's choice to give greater weight to the higher score reported by Dr. Patel was not unreasonable.

MetLife relied on the reports of numerous physicians, including physicians who actually examined and treated Plaintiff, and concluded that his ailments did not prevent him from returning to his job. Plaintiff's citation of evidence to the contrary in the record is insufficient for a finding that MetLife acted arbitrarily or capriciously; MetLife is entitled to choose to rely on some physicians over others unless Plaintiff shows that MetLife lacked a rational basis for doing so. *See McDonald*, 347 F.3d at 169. Plaintiff has not met that burden.

### IV. CONCLUSION

Accordingly, and for the foregoing reasons, **IT IS ORDERED** that MetLife's denial of benefits to Plaintiff is **AFFIRMED**.

This the 2nd day of March, 2006.



Signed By:

*Joseph M. Hood*

**United States District Judge**